UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| THE ERECTION COMPANY, et al.,<br>　　　　　　　　　　　Plaintiffs,<br>v.<br>ARCHER WESTERN CONTRACTORS, LLC, et al.,<br>　　　　　　　　　　　Defendants. | Case No. 2:12-cv-00612-MMD-NJK<br><br>ORDER |
| ARCHER WESTERN CONTRACTORS, LLC,<br>　　　　　　　　　　　Counterclaimant<br>v.<br>THE ERECTION COMPANY,<br>　　　　　　　　　　　Counterdefendant. | |
| ARCHER WESTERN CONTRACTORS, LLC,<br>　　　　　　　　　　　Cross-Claimant,<br>v.<br>POSTEL INDUSTRIES, INC.,<br>　　　　　　　　　　　Cross-Defendant. | |
| ARCHER WESTERN CONTRACTORS, LLC,<br>　　　　　　　　　　　Third-Party Plaintiff,<br>v.<br>TRAVELERS CASUALTY & SURETY COMPANY OF AMERICA, et al.,<br>　　　　　　　　　　　Third-Party Defendants. | |

I.　**SUMMARY**

　　Before the Court is The Erection Company, Inc.'s ("TEC") Motion for Summary Judgment Against Postel Industries, Inc. ("Postel") on its Counterclaim (dkt. no. 85). For the reasons set forth below, TEC's Motion is denied.

## II. BACKGROUND

### A. Facts[1]

The instant case concerns a dispute over the construction of a new control tower at McCarran International Airport ("the Project"). Clark County leased the property to the Federal Aviation Administration ("FAA") in order to build the control tower. On September 3, 2010, the FAA hired Archer Western Contractors ("Archer") to be the general contractor on the Project. (*See* dkt. no. 85 at 3.) Archer hired Postel as the subcontractor for steel fabrication around August 2011, and Postel in turn hired TEC as the subcontractor for steel installation in November 2011. (*See id.* at 3-4.)

TEC began work on the Project in November 2011. (*See id.*) TEC states that on February 16, 2012, it issued a Notice of Intent to Stop Work as it had yet to be paid for any of its work. (*See id.* at 9.) TEC claims that, realizing Postel was having problems, Archer served Postel with a Notice to Cure on February 20, 2012, and Postel abandoned the Project that same day. (*See id.* 9-10.) TEC received a check for $54,645.30 from Archer on February 27, 2012, and claims that at the time TEC filed its Motion, it was still owed over $230,000.00. (*See id.* at 10-11.) On February 28, 2012, TEC stopped work on the Project. (*See id.* at 11.) TEC issued two separate notices of termination.

### B. Procedural History

On March 13, 2012, TEC filed its Complaint in the Eighth Judicial District Court in Clark County. Archer filed its Petition for Removal on April 13, 2012. (Dkt. no. 1.) Archer filed its Amended Answer to Plaintiff's Complaint, Counterclaim, Cross-Claim and Third-Party Complaint on May 11, 2012. (Dkt. no. 9.) TEC filed its answer to Archer's Counterclaim on May 25, 2012 (dkt. no. 23), Travelers filed its answer on July 3, 2012 (dkt. no. 26), and Postel filed its answer September 19, 2013 (dkt. no. 27). Postel's

---

[1]The background facts are taken from TEC's Motion. While Postel and Archer dispute some of the facts asserted in TEC's Motion, these disputes do not affect the Court's consideration of the threshold legal issue presented as to the application of the Nevada Prompt Payment Act.

answer also included its own counterclaim, cross-claim, and third party complaint. TEC answered Postel on October 3, 2012 (dkt. no. 35), Travelers answered on October 9, 2012 (dkt. no. 36), and Archer answered on December 6, 2012 (dkt. no. 37). On February 11, 2013, the Court granted TEC's motion to file an amended complaint against Archer and Postel (dkt. no. 47) and an amended complaint against Travelers (dkt. no. 48).

TEC's Motion seeks summary judgment against Postel on its counterclaim for breach of contract. (Dkt. no. 85.) While TEC's Motion was exclusively against Postel, Archer has demonstrated that the Court's consideration of TEC's affirmative defense to Postel's breach of contract counterclaim would have significant implications for Archer's breach of contract counterclaim. The Court has considered the Motion and exhibits (dkt. nos. 85, 86), Postel's Response (dkt. no. 88), Archer's Response (dkt. no. 96), TEC's Reply (dkt. no. 107), and the parties' arguments at the hearing held on March 11, 2013 (dkt. no. 215).

### III. MOTION FOR SUMMARY JUDGMENT

#### A. Legal Standard

The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court. *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994). Summary judgment is appropriate when the pleadings, the discovery and disclosure materials on file, and any affidavits "show there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986). An issue is "genuine" if there is a sufficient evidentiary basis on which a reasonable fact-finder could find for the nonmoving party and a dispute is "material" if it could affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). Where reasonable minds could differ on the material facts at issue, however, summary judgment is not appropriate. *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995). "The amount of evidence necessary to raise a genuine issue of material fact is

enough 'to require a jury or judge to resolve the parties' differing versions of the truth at trial.'" *Aydin Corp. v. Loral Corp.*, 718 F.2d 897, 902 (9th Cir. 1983) (*quoting First Nat'l Bank v. Cities Service Co.*, 391 U.S. 253, 288–89 (1968)). In evaluating a summary judgment motion, a court views all facts and draws all inferences in the light most favorable to the nonmoving party. *Kaiser Cement Corp. v. Fishbach & Moore, Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986).

The moving party bears the burden of showing that there are no genuine issues of material fact. *Zoslaw v. MCA Distrib. Corp.*, 693 F.2d 870, 883 (9th Cir. 1982). "In order to carry its burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). Once the moving party satisfies Rule 56's requirements, the burden shifts to the party resisting the motion to "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256. The nonmoving party "may not rely on denials in the pleadings but must produce specific evidence, through affidavits or admissible discovery material, to show that the dispute exists," *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991), and "must do more than simply show that there is some metaphysical doubt as to the material facts." *Orr v. Bank of Am.*, 285 F.3d 764, 783 (9th Cir. 2002) (internal citations omitted). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient." *Anderson*, 477 U.S. at 252.

**B.     Discussion**

TEC seeks summary judgment on Postel's counterclaim for breach of contract. Specifically, TEC asks this Court to find that the Nevada Prompt Payment Act ("the Nevada PPA"), NRS 624.626, applies to the Project, that TEC complied with its requirements when TEC stopped work, and that summary judgment should therefore be

///

granted in favor of TEC. As the Court finds that the Nevada PPA is preempted by federal law, it need not reach the factual disputes raised by the parties.

### 1. Preemption

Under the Supremacy Clause, the laws of the United States "shall be the supreme Law of the Land ... any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const., Art. VI, cl. 2. "Federal preemption occurs when: (1) Congress enacts a statute that explicitly pre-empts state law; (2) state law actually conflicts with federal law; or (3) federal law occupies a legislative field to such an extent that it is reasonable to conclude that Congress left no room for state regulation in that field." *Chae v. SLM Corp.*, 593 F.3d 936, 941 (9th Cir. 2010) (citations omitted). The three categories of preemption are express, field, and conflict; field and conflict preemption are subcategories of implied preemption. *Stengel v. Medtronic, Inc.*, 704 F.3d 1224, 1230 (9th Cir. 2013). The parties concede that there is no express preemption in this case.

"Conflict preemption exists when a state requirement actually conflicts with a federal requirement, making impossible compliance with both requirements, or when a state requirement 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Id.* at 1231 (citing *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)). Field preemption arises when state law "regulates conduct in a field that Congress intended the Federal Government to occupy exclusively." *English v. Gen. Elec. Co.*, 496 U.S. 72, 79 (1990). "In deciding whether a federal law preempts a state counterpart, our only task is to ascertain the intent of Congress." *Pacific Merchant Shipping Ass'n v. Goldstene*, 639 F.3d 1154, 1165 (9th Cir. 2011).

#### a. Federal Scheme

The FAA is governed by a complex set of authorizing statutes and implementing regulations. In 1995, Congress decided that reform to the FAA's procurement process was necessary given concerns about mismanagement and inefficiency. *See* H.R. Conf. Rep. No. 104-286, at 76 (1995); S. Rep. No. 104-126, at 20 (1995). In response to

Congressional mandate, the FAA developed the FAA's Acquisition Management System ("AMS"). The AMS protects the federal government's procurements as well as its interest in aviation safety. See AMS § 2.3.4.1.[2] The AMS includes a provision dedicated to Prompt Payment in Construction Contracts ("the AMS Prompt Payment provision"). See id. § 3.3.1-19(c).

### b. State Scheme

Nevada's PPA was adopted in 2001 and includes procedures to help ensure that subcontractors need not continue to perform work for which they are not being paid. See NRS § 624.626. If a lower-tiered subcontractor has not been paid by a higher-tiered contractor within the amount of time allocated by the statute, the lower-tiered contractor may give notice to stop work and, if payment has not been received within ten days, may stop work. See id. A lower-tiered contractor may then terminate the contract after giving fifteen days of notice of termination and assuming the higher-tiered contractor failed to cure.

### 2. Analysis

The Nevada PPA is preempted by federal law in this case as application of both the state and federal schemes would result in a direct conflict. First, the AMS Prompt Payment provision and Nevada's PPA provide conflicting calculations for determining when payment is due to the subcontractor. Under Nevada's PPA, payment to a subcontractor may become due even if the higher-tiered subcontractor has not been paid. See NRS § 624.624(1). The AMS Prompt Payment provision, however, does not allow for funds to become due until the payor has obtained the funds. Specifically, the AMS Prompt Payment provision requires that the Contractor include in each subcontract a clause stating that payments to subcontractors are due "for satisfactory performance under its subcontract not later than 7 days from receipt of payment out of such amounts

---

[2] The FAA AMS is available at https://conwrite.faa.gov/CWClauseList.cfm?Show=Num,Title,Text,Pers,UCF,IBR&CatNum=3.3

as are paid to the Contractor under the contract." (Dkt. no. 96-3 at 61 (incorporating the AMS Prompt Payment provision into the contract between the FAA and Archer).) This provision, known as the "pay-when-paid" provision, was also explicitly included in the Postel subcontract with TEC. (See dkt. no. 88-6 at 5 ¶ 3 ("[T]he Prorated Amount, less all applicable retainage and offsets, shall become due and payable within seven (7) days after the Company has accepted the Services and has been paid by the Prime Contractor or Owner for such Services.").) In the instant case, where the parties assert that the higher-tiered subcontractor, Postel, was not being paid by Archer, the federal and state schemes would dictate opposite conclusions regarding whether and when funds had become due to TEC.[3] The two schemes, therefore, are in direct conflict.

Second, once a calculation has been made regarding when funds become due, federal and state law make available different remedies to unpaid subcontractors. The Nevada PPA allows lower-tier subcontractors to stop work under certain circumstances if they are not being paid, see NRS § 624.626(1), but the AMS provides no such right. Rather than provide work stoppage as a remedial measure, the AMS provides that an unpaid subcontractor may pursue payment from the required posted surety bond, pursuant to the terms of the Miller Act, 50 U.S.C. § 3131 et seq. Federal law, therefore, contemplates a remedy for the prompt payment of sub-contractors that is separate and distinct from Nevada's.

TEC contends that Nevada's PPA does not conflict with the AMS because the AMS does not expressly limit a lower-tiered contractor from stopping work. However, as discussed above, the different payment schemes alone present a direct conflict. Indeed, not only does the federal scheme fail to provide subcontractors with the option to stop work if they are owed past due funds, such a provision would be contrary to the purpose of the AMS. The development of the AMS was specifically directed to "modernize the

---

[3] The Court need not resolve at this juncture the parties' disputes regarding the amount owed as it declines to find that the Nevada PPA applies.

FAA in the most efficient and cost-effective manner." H.R. Conf. Rep. No. 104-286, at 76 (1995); *see also* S. Rep. No. 104-126, at 20 (1995). Allowing unpaid sub-contractors to stop work would increase cost and delay, in direct contravention to the FAA's goals.

TEC relies on 31 U.S.C. § 3905 to argue that the AMS provides for a lower-tier contractor to stop work if permitted under state law. Section 3905(j) states, in pertinent part, that it does not limit "any contractual, administrative, or judicial remedies otherwise available" to a subcontractor in the event of a dispute involving late payment. This section does not provide for a parallel state prompt payment scheme that directly conflicts with the AMS. Moreover, these other remedies remain available to a lower-tier subcontractor, such as TEC, to obtain payment.

While the Court is sympathetic to the difficult position lower-tier subcontractors can be placed in when required to continue work without full pay, this equitable concern cannot defeat the Supremacy Clause. The Court therefore finds that Nevada's PPA does not apply to this dispute.

## IV. SUPPLEMENT TO RESPONSE TO MOTION

In addition to Archer's Response to TEC's Motion, Archer filed a supplement on September 3, 2013. (Dkt. no. 106.) Local Rule 7-2(a)(c) allows a motion, a response and a reply. No provision exists for filing a sur-reply. Thus, a party must obtain leave from the Court before filing a sur-reply. "A sur-reply may only be filed by leave of court, *and only to address new matters raised in a reply to which a party would otherwise be unable to respond.*" *Kanvick v. City of Reno*, No. 3:06-CV-00058, 2008 WL 873085, at *1, n.1 (D. Nev. March 27, 2008) (emphasis in original). Further, sur-replies "are highly disfavored, as they usually are a strategic effort by the nonmovant to have the last word on a matter." *Lacher v. W.*, 147 F. Supp. 2d 538, 539 (N.D. Tex. 2001).

Archer did not seek leave from this Court before filing a sur-reply. Additionally, while the Court concludes that Archer determined that a supplemental filing was necessary given information revealed in the deposition of Adam Jones two days after

///

Archer filed its Response, Archer did not make clear in its filing why additional briefing was necessary. The Court therefore declines to consider Archer's supplement.[4]

## V.  JOINDER TO MOTION FOR SUMMARY JUDGMENT

On December 19, 2013, Travelers sought joinder to TEC's Motion for Summary Judgment. (Dkt. no. 147.) Travelers asserts that, as TEC's surety, Postel's claims against it are exclusively derivative of Postel's claims against TEC and it is entitled to assert all of TEC's defenses as defenses to claims against the bond. (*See id.* at 2-3.) Travelers therefore seeks to join TEC's Motion or, in the alternative, moves for summary judgment on the same defense that TEC asserts in its Motion. Travelers' Motion for Summary Judgment is nearly identical to TEC's.

TEC's Motion for Summary Judgment was fully briefed on September 5, 2013, and the deadline for filing dispositive motions was September 30, 2013 (dkt. no. 67). Travelers provides no explanation for its failure to file a timely joinder. The Court finds that Travelers' joinder is untimely and that its motion is denied for the reasons set forth in Section IV *supra*.

## VI.  CONCLUSION

The Court notes that the parties made several arguments and cited to several cases not discussed above. The Court has reviewed these arguments and cases and determines that they do not warrant discussion as they do not affect the outcome of the Motion.

It is therefore ordered that The Erection Company, Inc.'s Motion for Summary Judgment Against Postel Industries, Inc. on its Counterclaim (dkt. no. 85) is denied.

It is further ordered that Travelers Casualty and Surety Company of America's Joinder to the Erection Company's Motion for Summary Judgment Against Postel

///

---

[4]Given the Court's finding that Nevada's PPA is preempted by federal law, consideration of Archer's sur-reply would not affect its judgment.

Industries, Inc. on its Counterclaim, or, in the Alternative, Motion for Summary Judgment (dkt. no. 147) is denied.

DATED THIS 17th day of March 2014.

MIRANDA M. DU
UNITED STATES DISTRICT JUDGE