UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| THE ERECTION COMPANY, et al., | Case No. 2:12-cv-00612-MMD-NJK |
| Plaintiffs, | ORDER |
| v. | |
| ARCHER WESTERN CONTRACTORS, LLC, et al., | |
| Defendants. | |
| ARCHER WESTERN CONTRACTORS, LLC, | |
| Counterclaimant | |
| v. | |
| THE ERECTION COMPANY, | |
| Counterdefendant. | |
| ARCHER WESTERN CONTRACTORS, LLC, | |
| Cross-Claimant, | |
| v. | |
| POSTEL INDUSTRIES, INC., | |
| Cross-Defendant. | |
| ARCHER WESTERN CONTRACTORS, LLC, | |
| Third-Party Plaintiff, | |
| v. | |
| TRAVELERS CASUALTY & SURETY COMPANY OF AMERICA, et al., | |
| Third-Party Defendants. | |

**I.     SUMMARY**

This Order addresses the following pending motions: (1) The Erection Company's ("TEC") Motion for Summary Judgment Against Postel Industries ("Postel")[1] on Its Counter-Claim (Re: Postel's Abandonment) (dkt. no. 151); (2) TEC's Motion for Summary Judgment Against Archer Western Contractors ("Archer") on All Claims (Re: Invalid Assignment) (dkt. no. 152); (3) TEC's Motion for Partial Summary Judgment Against Archer on Its Affirmative Claims (Re:  Standing In Postel's Shoes) (dkt. no. 153); (4) Postel's Motion for Summary Judgment Against TEC (dkt. no. 154); (5) Defendant Travelers Casualty and Surety Company of America's ("Travelers") Motion for Partial Summary Judgment (dkt. no. 158); (6) Archer's Motion for Partial Summary Judgment on The Third Cause of Action of Its Crossclaim Against Postel (dkt. no. 159); (7) Archer's Motion for Summary Judgment on the Third and Fourth Causes of Action of Postel's Crossclaims Against Archer (dkt. no. 160); (8) Archer's Motion for Summary Judgment on Plaintiff's First and Second Claims for Relief (dkt. no. 161); (9) Archer's Motion for Partial Summary Judgment on Plaintiff's Third Claim for Relief (dkt. no 162); (10) Archer's Motion for Partial Summary Judgment on the First Cause of Action of its Counterclaim Against Plaintiff (dkt. no. 163); (11) Archer's Motion to Strike or Disregard the Affidavit of Danny Lucas (dkt. no. 201); and (12) TEC's Motion for Clarification and/or Relief from Order (dkt. no. 218).[2]  Travelers joined in all four of TEC's motions. (Dkt. nos. 155, 156, 157, 219.)

///

///

---

[1]TEC names three Postel entities:  Postel Erection Group, LLC; Postel West, Inc.; and Postel Industries, Inc. (Dkt. no. 48.) The first two entities were dismissed pursuant to the parties' stipulation. (Dkt. no. 150.)

[2]TEC filed three separate motions for partial summary judgment while Archer filed five separate motions. Why these separate motions were not filed as one consolidated motion by each party is beyond contemplation. The separate motions result in duplicative filings, repetitive recitations of claimed undisputed facts and standards of review, and a burden on the Court in having to review multiple duplicative filings and tracking multiple responses, replies, joinders and response to joinders.

## II.    BACKGROUND

This dispute arises from the construction of a new air traffic control tower at McCarran International Airport ("the Project"). Clark County leased the property to the Federal Aviation Administration ("FAA") in order to build the control tower. (Dkt. no. 86-2.) On September 3, 2010, the FAA hired Archer to be the general contractor on the Project. (Dkt. no. 85 at 3; dkt. no. 96 at 8.) In May 2011, Archer hired Postel as the subcontractor for steel fabrication and installation, and Postel, in turn, hired TEC as the subcontractor for steel installation.[3] (Dkt. no. 85 at 3-4; dkt. no. 96 at 10; dkt. no. 27 at 10.) The contract between Archer and Postel ("Postel Subcontract") expressly incorporated the prime contract between Archer and the FAA (dkt. no. 96-4 at 2); the contract between Postel and TEC ("TEC Subcontract") expressly incorporated the Postel Subcontract (dkt. no 88-5 at 2).[4] Archer obtained a payment bond and a performance bond from Travelers. (Dkt. no. 85 at 9; dkt. no. 96 at 8.)

According to TEC, it expected to start work after Archer installed the rebar and concrete to form the tower walls up to approximately the fifth level. (Dkt. no. 86 at 4.) At that point, TEC would begin installing structural steel anchored to the concrete walls to support the stairs, landings, and deck that it would also install. (*Id.*) TEC would then generally follow behind Archer's work by about two floors. (*Id.*) TEC commenced work on November 14, 2011, and completed work through level 12. (*Id.*) However, a dispute arose about alleged performance and payment that led Postel to assign the TEC Subcontract to Archer, and that prompted TEC to issue notices of intent to stop work.

With respect to performance, on November 19, 2011, Archer put Postel on notice that the FAA's inspectors had discovered deficiencies in the stairs that Postel had

---

[3]The parties offer different dates for the two pertinent subcontracts. Both subcontracts identify May 20, 2011 as the agreement date, but the Postel Subcontract was signed several months later. (Dkt. no. 96-4; dkt. no. 88-6.) TEC asserts that the TEC Subcontract was signed on November 8, 2011. (Dkt. no. 86 ¶ 10.)

[4]TEC disputes that the TEC Subcontract incorporated the Postel Subcontract. (Dkt. no. 182 at 6.)

1  delivered to the Project and that the issue was affecting the Project schedule. (Dkt no.

2  96-5.) On January 3, 2012, Archer requested that Postel submit a recovery schedule for

3  stair no. 3 because Postel and TEC were behind schedule and were more than two

4  floors below Archer's concrete operation. (Dkt. no. 96-7.) On January 13, 2012, Archer

5  sent Postel another letter to relate that Postel had not provided a recovery schedule and

6  to provide notice that Archer would be withholding all future payments to Postel until

7  issues identified in the letter had been addressed. (Dkt. no. 96-8.)  On February 20,

8  2012, Archer served Postel with a "Notice to Cure," stating that Postel had failed to

9  comply with the parties' contract terms and that Postel had informed Archer that it "no

10  longer wishes to perform contractual obligations." (Dkt. no. 86-9.)

11      In the meantime, on February 16, 2012, TEC issued to Postel a "Notice of Intent

12  to Stop Work" because, according to TEC, it had yet to be paid for any of its work. (Dkt.

13  no. 85 at 14; dkt. no. 86-8.) In that Notice, TEC stated that Postel owed at least

14  $80,000.00 for two months of base-contract work and for extra work billed; TEC

15  demanded payment within ten (10) days. (Dkt. no. 88-8.) On February 22, 2012, TEC

16  notified Postel that it had learned from Archer that Postel had abandoned the Project,

17  which TEC construed to be a material breach of the TEC Subcontract. (Dkt. no. 86-10.)

18  TEC stated that it "is immediately stopping all work on the Project." (*Id.*) On February 24,

19  2012, TEC notified Archer that it would be stopping work on February 28, 2012.[5] (Dkt.

20  no. 86-15.) TEC stopped work as noticed.[6]  (Dkt. no. 86-16.)

21      On February 24, 2012, Archer sent TEC a letter along with payment on behalf of

22  Postel in the amount of $54,645.30 for what Archer characterized as "properly supported

23  _____

24      [5]In the same letter, TEC referenced Archer's rejection of its proposed "Time &

25  Materials Agreement," the purpose of which was to allow TEC to continue working on the
    Project. (Dkt. no. 86-15.)

26      [6]The records offer conflicting dates as to when TEC stopped work on the Project.
    TEC's February 22, 2012, letter stated it was stopping work immediately (dkt. no. 86-10),

27  but TEC's February 24, 2012, letter to Archer stated that it would stop work on February
    28, 2012, and would demobilize on February 29, 2012 (dkt. no. 86-15). Thus, at the

28  latest, TEC stopped work on February 29, 2012.

4

and documented pay applications through the end of December, 2011."[7]  (Dkt. no. 96-9.) In the same letter, Archer acknowledged that there may be invoices for extra work but contended that TEC had not submitted proper supporting documents; Archer invited TEC to provide the documentation. (*Id.*) Archer claims that TEC did not submit the requested documentation. (Dkt. no. 96-1 ¶ 29.) TEC claims no further documentation was needed because it had provided all supporting documents to Postel. (Dkt. no. 182 at 6; dkt. no. 86 at 5-6.) In a letter dated February 27, 2012, Archer informed TEC that Postel had not abandoned the Project and was involved and committed to work with Archer to fulfill Postel's contractual obligations to Archer. (Dkt. no. 96-10.) Archer contended that the Postel Subcontract, which was incorporated into the TEC Subcontract, provides for the assignment of the TEC Subcontract to Archer. (*Id.*) Archer also insisted that TEC had no legitimate reason to stop work. (*Id.*) On February 28, 2012, TEC gave Postel further Notice of Intent to Terminate in fifteen (15) days (on March 14, 2012).[8] (Dkt. no. 86-18.) On March 2, 2012, TEC notified Postel that it had ceased work and demobilized from the Project as a result of Postel's failure to pay and abandonment of the Project. (Dkt. no 86-19.)

On March 1, 2012, Archer and Postel entered into an Assignment Agreement ("the Assignment") where Postel agreed to assign all of "its rights and obligations under the TEC Subcontract" to Archer. (Dkt. no. 96-1 ¶ 32; dkt. no. 96-11.) The next day, Archer notified TEC that it had taken an assignment of the TEC Subcontract. (Dkt. no. 86-20.) Archer again disputed TEC's contention that Postel had abandoned the Project and that TEC had not been paid for all properly supported payment applications through December. (*Id.*) Archer further took the position, which TEC disputes, that TEC was in default and issued a notice to cure. (*Id.*) TEC acknowledged notice of the assignment of

---

[7]TEC received the letter on February 27, 2012. (Dkt. no. 85 at 10.) TEC contends that, by that time, the payment from Archer still left a balance of over $250,000.00. (Dkt. no. 86 at 11; dkt. no. 86-19.)

[8]TEC asserts that it acted pursuant to advice of counsel to comply with Nevada's Prompt Payment Act. (Dkt. no. 85 at 17.)

the TEC Subcontract and indicated its willingness to re-mobilize and return to the Project provided that Archer pay three enumerated past due amounts totaling about $52,147.00. (Dkt. no. 96-13.) Archer rejected TEC's payment demand and insisted that TEC remobilize and agree to "the terms of the new project recovery schedule via change order and accept a back charge in the amount of $72,356 for the direct delay" caused by TEC. (Dkt. no. 96-14.) On March 15, 2012, Archer declared TEC to be in default. (Dkt. no. 96-15.)

TEC's First Amended Complaint asserts claims for breach of contract, breach of the implied covenant of good faith and fair dealing, and unjust enrichment against Postel and Archer. (Dkt. no. 48.) Archer asserts claims for breach of contract and negligence against TEC, and claims for contractual indemnity and breach of contract against Postel. (Dkt. no. 9.) Postel similarly asserts claims for breach of contract and negligence against TEC, and claims for contractual indemnity and breach of contract against Archer. (Dkt. no. 27.) All three parties assert separate claims against Travelers on the payment and performance bonds. (*Id.*; dkt. nos. 48, 9.)

TEC subsequently moved for summary judgment against Postel on its counterclaim for breach of contract. (Dkt. no. 85.) The Court denied TEC's motion, and TEC now seeks clarification and reconsideration. (Dkt. nos. 217, 218.)

**III.   LEGAL STANDARD**

**A.   Summary Judgment**

The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court. *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994). Summary judgment is appropriate when the pleadings, the discovery and disclosure materials on file, and any affidavits "show there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986). An issue is "genuine" if there is a sufficient evidentiary basis on which a reasonable fact-finder could find for the nonmoving party and a dispute is "material" if it could affect the outcome of the suit

under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). Where reasonable minds could differ on the material facts at issue, however, summary judgment is not appropriate. *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995). "The amount of evidence necessary to raise a genuine issue of material fact is enough 'to require a jury or judge to resolve the parties' differing versions of the truth at trial.'" *Aydin Corp. v. Loral Corp.*, 718 F.2d 897, 902 (9th Cir. 1983) (quoting *First Nat'l Bank v. Cities Service Co.*, 391 U.S. 253, 288–89 (1968)). In evaluating a summary judgment motion, a court views all facts and draws all inferences in the light most favorable to the nonmoving party. *Kaiser Cement Corp. v. Fishbach & Moore, Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986).

The moving party bears the burden of showing that there are no genuine issues of material fact. *Zoslaw v. MCA Distrib. Corp.*, 693 F.2d 870, 883 (9th Cir. 1982). "In order to carry its burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). Once the moving party satisfies Rule 56's requirements, the burden shifts to the party resisting the motion to "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256. The nonmoving party "may not rely on denials in the pleadings but must produce specific evidence, through affidavits or admissible discovery material, to show that the dispute exists," *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991), and "must do more than simply show that there is some metaphysical doubt as to the material facts." *Orr v. Bank of Am.*, 285 F.3d 764, 783 (9th Cir. 2002) (internal citations omitted). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient." *Anderson*, 477 U.S. at 252.

///

///

7

### B.    Clarification And Reconsideration

Under Fed. R. Civ. P. 60(b), a court may relieve a party from a final judgment, order or proceeding only in the following circumstances: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence; (3) fraud; (4) a void judgment; (5) a satisfied or discharged judgment; or (6) any other reason justifying relief from the judgment. *Backlund v. Barnhart*, 778 F.2d 1386, 1387 (9th Cir. 1985). "Relief under Rule 60(b)(6) must be requested within a reasonable time, and is available only under extraordinary circumstances." *Twentieth Century-Fox Film Corp. v. Dunnahoo*, 637 F.2d 1338, 1341 (9th Cir. 1981) (internal citations omitted). A motion for reconsideration must set forth the following: (1) some valid reason why the court should revisit its prior order; and (2) facts or law of a "strongly convincing nature" in support of reversing the prior decision. *Frasure v. United States*, 256 F. Supp. 2d 1180, 1183 (D. Nev. 2003). On the other hand, a motion for reconsideration is properly denied when the movant fails to establish any reason justifying relief. *Backlund* 778 F.2d at 1388 (holding that a district court properly denied a motion for reconsideration in which the plaintiff presented no arguments that were not already raised in his original motion).

## IV.    TEC'S MOTION FOR CLARIFICATION/RECONSIDERATION (DKT. NO. 218)

TEC's motion seeks both clarification and reconsideration of the Court's Order denying summary judgment ("Order"). (Dkt. no. 217.) In that Order, the Court ruled on the primary issue presented in TEC's motion for summary judgment — whether Nevada's Prompt Payment Act ("PPA") applies to the TEC Subcontract dispute. The Court found that the Nevada PPA does not apply because it is preempted by federal law. (*Id.*) TEC suggests that the parties may misconstrue the Order to hold that TEC is barred from pursuing its state law remedies. Archer's response clarifies that there is no such misinterpretation. Nevertheless, to the extent there is any confusion about the scope of the Court's Order, the Court clarifies that the Order does not address the merits of TEC's breach of contract claim. As for TEC's request that the Court clarify that the Order is not intended to adjudicate any violation of federal law or TEC's right to pursue the payment

bond under the Miller Act, there is no need for clarification since these issues were neither presented in TEC's motion for summary judgment nor considered by the Court. Again, Archer's response shows there is no confusion as to these issues. The Court thus grants TEC's request for clarification in part as stated. The Court denies TEC's request for reconsideration as TEC has not offered any convincing arguments to persuade the Court that it made a mistake.

**V.     TRAVELERS' MOTION (DKT. NO. 158)**

Travelers seeks a ruling that TEC is barred from recovering lost profits under the payment bond. (Dkt. no. 158.) TEC did not file a response. The Court agrees with Travelers that the Miller Act, 40 U.S.C. § 3131 et seq., bars a subcontractor such as TEC from recovery of unrealized profits. Travelers' motion (dkt no. 158) is granted.

**VI.    REMAINING MOTIONS**

The remaining motions raise issues that are so intertwined that the Court will address them in groups. Several motions rely on facts that the Court finds to be in dispute. The remainder of the motions generally relates to the Assignment and will be addressed collectively.

**A.     Factual Disputes**

Viewing the evidence in the light most favorable to the non-moving parties, the Court finds a genuine issue exists as to the following material facts. These disputes preclude summary judgment as discussed further below.

**1.     Postel's Alleged Abandonment of the Project**

The parties have presented a genuine issue of material fact as to whether Postel abandoned the Project. TEC argues that Postel abandoned the Project and Archer acknowledged this fact. As support, TEC offers Archer's February 20, 2012, Notice to Cure to Postel and TEC's February 22, 2012, letter to Postel, in which TEC stated it had learned from Archer that Postel had abandoned the Project. (Dkt. nos. 86-9, 86-10.) However, in a subsequent letter dated February 28, 2012, TEC claimed it was receiving conflicting information as to whether Postel had abandoned the Project. (Dkt. no. 86-16.)

1   In letters dated February 27 and March 2, 2012, Archer disputed TEC's contention that

2   Postel had abandoned the Project. (Dkt. nos. 96-10, 86-20.) In fact, Archer stated in the

3   February 27, 2012, letter that Postel was then involved and committed to work with

4   Archer to fulfill Postel's contractual obligations to Archer. (Dkt. no. 96-10.)

5        Two of TEC's motions are premised on the Court's finding that Postel abandoned

6   the Project. (Dkt. nos. 151, 153.) These two motions are therefore denied.[9]

7                **2.      TEC's Responsibilities under the TEC Subcontract**

8        The Court finds that there is a genuine factual dispute as to whether TEC

9   breached the TEC Subcontract and whether TEC was justified in demobilizing from the

10  Project and in refusing to remobilize until three invoices were paid. The parties offer

11  conflicting evidence about TEC's progress, Postel's work, and alleged delays to the

12  Project caused by either Postel and/or TEC. First, TEC contends that it completed work

13  through level 12. (Dkt. no. 86 at 4.) Archer argues that Postel and TEC were behind

14  schedule and that it notified Postel that Archer would be withholding payments to Postel

15  until deficiencies that Archer identified — including Postel's failure to provide a recovery

16  schedule — had been addressed. (Dkt. no. 96-8). In fact, in the February 20, 2012,

17  Notice to Cure to Postel, Archer took the position that Postel had failed to comply with

18  the parties' contract terms. (*Id.*) This Notice, however, does not address any contention

19  about TEC's alleged failure to perform.

20       With regard to payments made to TEC, the parties dispute why TEC was not paid

21  as it demanded (i.e., because of insufficient documentation and applications for

22  payment), but they agree that Archer only paid TEC the $54,645.30 referenced in

23

24       [9]In one of these motions, TEC raises the legal issue of Archer's right to assert its
25  negligence claim. (Dkt. no. 153 at 9.) This argument defies logic. TEC contends that
    because Archer had no contractual privity with TEC, Archer cannot assert a claim for
26  negligence where it only seeks economic loss. At the same time, TEC argues that
    Archer's rights acquired by assignment of the TEC Subcontract are limited by Postel's
27  rights under the same agreement because Archer stands in the shoes of Postel.
    Applying this same logic, the assignment of the TEC Subcontract establishes Archer's
28  contractual privity with TEC.

10

1   Archer's February 24, 2012, letter (dkt. no. 96-9), after TEC had notified both Archer and

2   Postel that more invoices were outstanding. (*See* Notice to Postel, dkt no. 86-8 (TEC

3   stated that Postel owed at least $80,000.00); Letter to Archer, dkt. no. 96-13 (TEC

4   demanded payments on three invoices before it would remobilize).) In fact, in one of

5   Archer's letters, Archer acknowledged that there may be invoices for extra work but

6   contended that proper supporting documents had not been submitted and invited TEC to

7   provide the supporting documentation. (Dkt. no. 96-9.)  Archer claims that TEC did not

8   submit the requested documentation to support additional payments (dkt. no. 96-1 ¶ 29)

9   while TEC asserts that no further documentation was needed because it had provided all

10  supporting documents to Postel (dkt. no. 182 at 6; dkt. no. 86 at 5-6.) TEC also disputes

11  that its work was defective and offers evidence that it submitted a proposed "Time &

12  Materials Agreement" to Archer to continue work on the Project. (Dkt. no. 86 at 9-13; dkt.

13  no. 182 at 9; dkt. no. 86-15.) Moreover, Archer's demand that TEC remobilize came with

14  a condition that TEC agree to "the terms of the new project recovery schedule via

15  change order and accept a back charge in the amount of $72,356 for the direct delay"

16  caused by TEC. (Dkt. no. 96-14.) As discussed, TEC's contention is that it is owed more,

17  not that it owed Archer for any delays.

18          Given these genuine factual disputes, the Court cannot find that TEC breached

19  the TEC Subcontract when it stopped work and refused to return as Archer demanded.

20  The fact that Postel does not believe Archer breached the Postel Agreement does not

21  resolve these factual disputes. (*See* dkt. no. 162-1 at 4.) Accordingly, Archer's motion for

22  summary judgment on its first counterclaim for breach of contract against TEC (dkt. no.

23  163) is denied.

24          **3.      Postel's Alleged Performance under the TEC Subcontract**

25          The gist of TEC's claims involves payments for work performed under the TEC

26  Subcontract and Postel and Archer's alleged failure to perform their contractual

27  obligations. (Dkt. no 48 at 4-5.) TEC claims it was not paid in part because Postel failed

28  to submit payment applications to Archer while Archer contends that certain payment

1   applications were inadequate and that invoices for extra work were not properly

2   supported. It is not clear from the records whether these issues were communicated to

3   TEC.

4         Archer's communications to Postel show that Archer had issues with Postel's

5   performance and its failure to follow the work schedule under the Postel Subcontract.

6   (*See, e.g.*, dkt. nos. 96-7, 96-8, 86-9.) Postel seems to dispute both TEC's and Archer's

7   allegations by claiming that it was merely a pass-through subcontractor and that it could

8   not pay TEC if Archer failed to pay. There is a genuine dispute as to whether Postel

9   timely and properly billed Archer for TEC's work as required under the TEC Subcontract,

10  and whether Postel was deficient in paying TEC. (Dkt. no. 192 at 3-14.) Postel raises the

11  "pay-when-paid" provision in the TEC Subcontract, contending that it was never paid for

12  TEC's work and that Archer never approved or paid any change order requests

13  submitted by TEC. (Dkt. no. 154 at 6-11.) This argument misses the point. TEC claims

14  Postel did not submit timely payment, so the fact that Archer did not pay would not

15  necessarily absolve Postel of its responsibility under the TEC Subcontract. TEC further

16  claims that apart from payments under the Postel Subcontract, Postel received a benefit

17  for extra work that TEC performed at Postel's request and for which TEC was not

18  compensated. (Dkt. no. 192 at 31-32.)

19        The intertwined and disputed allegations relating to payments under the Postel

20  Subcontract and the TEC Subcontract alone create a genuine issue of fact. These

21  disputes preclude summary judgment in favor of Postel on TEC's claims for breach of

22  contract, breach of the implied covenant of good faith and fair dealing, and unjust

23  enrichment. Postel's motion for summary judgment against TEC (dkt. no. 154) is denied.

24        **B.     Issues Involving the Assignment**

25              **1.     Validity**

26        TEC advances two challenges to the validity of the Assignment: first, the

27  Assignment violates paragraph 8.8 of the Postel Subcontract because Archer and Postel

28  claim that Postel was not in default; and second, paragraph 24.5 of the TEC Subcontract

1   prevents Postel from assigning the TEC Subcontract. Archer counters that the

2   Assignment did not occur under paragraph 8.8 of the Postel Subcontract and argues that

3   paragraph 24.5 of the TEC Subcontract does not restrict assignment by Postel. The

4   Court agrees with Archer.

5        A contract is unambiguous if it is not susceptible to more than one interpretation.

6   *See Margrave v. Dermody Props.*, 878 P.2d 291, 293 (Nev. 1994). The Court finds that

7   the pertinent provisions of the Assignment — paragraph 8.8 of the Postel Subcontract

8   and paragraph 24.5 of the TEC Subcontract — are not susceptible to more than one

9   meaning. In fact, the parties do not contend that these provisions are ambiguous.

10   "[W]here a document is clear and unambiguous on its face, the court must

11   construe it from the language therein." *S. Trust Mortg. Co. v. K&B Door Co., Inc.*, 763

12   P.2d 353, 355 (Nev. 1988). Additionally, when construing a contract, a court should

13   consider the contract as a whole and "should not interpret a contract so as to make

14   meaningless its provisions." *Phillips v. Mercer*, 579 P.2d 174, 176 (Nev. 1978). In terms

15   of assignment, "a contractual right is assignable unless assignment materially changes

16   the terms of the contract or the contract expressly precludes assignment." *Easton Bus.*

17   *Opportunities, Inc. v. Town Exec. Suites-E. Marketplace, LLC,* 230 P.3d 827, 830 (Nev.

18   2010) (citing Restatement (Second) of Contracts § 317(2)(a)-(c) (1981)).[10] Moreover,

19   "anti-assignment clauses are narrowly construed." *Id.* (citation and internal quotation

20   marks omitted).

21        Applying these contract principles here, the TEC Subcontract does not limit

22   assignment to Archer only upon termination for Postel's default. Paragraph 8.8 requires

23   Postel to contingently assign all of its "subcontracts and purchase orders relating to the

24   Project." (Dkt. no. 96-4 ¶ 8.8.) Paragraph 8.8 then states that such assignment "shall

25

26   ───────────────

27        [10]The TEC Subcontract provides that "the laws of the State where the Project is
    located" (Nevada) govern their contract dispute. (Dkt. no. 86-5, ¶ 24.1.) The Court thus
28   looks to Nevada law. The decision in *Easton* is the latest case where the Nevada
    Supreme Court addresses the validity and effect of an assignment.

take effect only upon Subcontractor's [Postel's] termination for default." (*Id.*) TEC argues that the phrase "only upon" Postel's termination shows the parties' intent to allow assignment to Archer only when Postel has defaulted. Paragraph 8.8 contains no such limitation. The use of the phrase "only upon" Postel's termination expresses when the conditional assignment would take effect; it does not limit assignment to Archer only in the event of Postel's default.

TEC argues that because paragraph 8.8 does not expressly authorize assignment to Archer under any other circumstances, and because the Postel Subcontract was incorporated into the TEC Subcontract, Archer and Postel promised that the TEC Subcontract would not be assigned other than upon Postel's termination for default. To support this argument, TEC offers a construction of paragraph 24.5 of the TEC Subcontract that is contrary to its plain meaning. Paragraph 24.5 of the TEC Subcontract states as follows:

> This Subcontract shall not be subcontracted or assigned in whole or in part by the subcontractor [TEC] except with the written consent of the Company [Postel]. Any attempt to effectuate a subcontract or an assignment shall be null and void *ab initio.*

(Dkt. no 88-5 ¶ 24.5.)  TEC argues that the second sentence in paragraph 24.5 restricts all assignments, whether from TEC or Postel. TEC's construction, however, ignores the first sentence, which restricts only assignments by TEC. The second sentence must be read in context of the entire paragraph. Viewed as a whole, the first sentence restricts TEC from assigning the TEC Subcontract without Postel's written consent, while the second sentence addresses the effect of an assignment by TEC without Postel's consent (i.e., the assignment would be void). Moreover, under TEC's construction, TEC may assign with Postel's consent, but Postel may not assign at all. Paragraph 24.5 does not support this broad construction. "To be effective, an anti-assignment clause should contain a specific prohibition on the power to make an assignment and specifically state that any attempted assignments will be void or invalid." *Easton*, 230 P.3d at 830 (quoting 29 Richard A. Lord, *Williston on Contracts* § 74:22 (4th ed. 2003)) (alterations and

1    internal quotation marks omitted). The assignment clause in paragraph 24.5 contains no

2    express prohibition on Postel's power to make an assignment. Because the TEC

3    Subcontract does not expressly prohibit assignment by Postel, Postel may assign it to

4    Archer. *See id.*

5          In sum, the Court finds that the Assignment is valid. TEC's motion requesting that

6    the Court find the Assignment to be invalid (dkt. no. 152) is denied.

7              **2.**    **Effect**

8          Archer raises the issue of the effect of the Assignment in three motions. In the

9    motion against TEC, Archer argues that TEC's two contract-based claims are legally

10    tenuous because Archer had no contractual relationship with TEC before March 1, 2012,

11    the effective date of the Assignment. (Dkt. no. 161.) In a motion against Postel (dkt. no.

12    159), Archer argues that Postel owes a duty to indemnify Archer for any conduct that

13    occurred before the effective date of the Assignment. In another motion against Postel

14    (dkt. no. 160), Archer seeks partial summary judgment on Postel's third and fourth

15    claims for breach of contract relating to the Assignment. The Court agrees with Archer in

16    part.

17          In arguing that the Assignment is valid, Archer acknowledges the general rule that

18    an assignment is invalid if it "materially changes the terms of the contract." *Easton*, 230

19    P.3d at 830. But Archer seeks to impose the terms of the Assignment to limit TEC's

20    rights under the TEC Subcontract.[11] Archer ignores the effect of an assignment of a

21    contractual right.

22          An assignment "is a separate agreement between the assignor and assignee

23    which merely transfers the assignor's contract rights, leaving them in full force and effect

24    as to the party charged." *Easton*, 230 P.3d at 831 (quoting *Citibank, N.A. v.*

25    *Tele/Resources, Inc.*, 724 F.2d 266, 269) (2d Cir. 1983)). Archer in fact cites to this

26

27            [11]TEC does not contend that the Assignment results in any material changes in

28    the terms of the TEC Subcontract.

1   same language in its brief. (Dkt. no. 190 at 11.) However, Archer then seeks to import

2   the terms of the Assignment into the TEC Subcontract, which would change the terms of

3   the TEC Subcontract. Archer cannot have it both ways.[12]

4         The Assignment unambiguously expresses the rights assigned: Postel "hereby

5   assigns, transfers and sets over to Archer Western Contractors, LLC ("Assignee") all

6   rights, title and interest held by the Assignor [Postel] in and to the following described

7   contract: [TEC Subcontract]." (Dkt. no. 96-11 at 2.) The Assignment thus puts Archer in

8   the place and stead of Postel under the TEC Subcontract. *See Citibank*, 724 F.3d at 269

9   (citing 3 *Williston on Contracts* § 432, at 182 (3d ed.)) ("Insofar as an assignment

10  touches on the obligations of the other party to the underlying contract, the assignee

11  simply moves into the shoes of the assignor.")

12        Archer argues that the Assignment contains an additional paragraph delineating

13  what Archer and Postel agree to be the scope of the Assignment. True enough. This

14  paragraph, however, identifies the parties' assumptions, not the assignment — Archer

15  "assumes and agrees" to "perform all remaining and executory obligations of" Postel and

16  to "indemnify and hold the Assignor [Postel] harmless from any claim or demand

17  resulting from non-performance by the Assignee from the date of this Assignment

18  forward." (Dkt. no. 96-11 at 2.) This paragraph contains a reciprocal agreement from

19  Postel to assume and agree to remain responsible for contractual obligations existing

20  before the date of the Assignment and to indemnify and hold Archer harmless. (*Id.)*

21  According to Archer, this paragraph limits its liability to TEC under the TEC Subcontract

22  to conduct that occurred before the Assignment. The paragraph does limit liability, but

23  only between Archer and Postel in that it allocates these two parties' respective

24  responsibilities and assumptions of liabilities. It does not limit or modify the obligations

25  _____

26        [12]Archer is not alone. TEC claims it is undisputed that TEC did not have any
27  privity of contract with Archer. (Dkt. no. 182 at 11.) Yet, TEC asserts two contract-based
    claims against Archer premised on the TEC Subcontract and opposes dismissal of these
28  claims. (*See* dkt. nos. 48, 189.)

1   under the TEC Subcontract, and Archer cannot seek to import this paragraph to the TEC

2   Subcontract.[13]

3       Because the Assignment puts Archer in the place and stead of Postel under the

4   TEC Subcontract, TEC can assert its two contract-based claims against Archer. Archer's

5   motion for summary judgment on TEC's first and second claims for relief (dkt. no. 161) is

6   therefore denied. The Court agrees with Archer that the existence of a contractual

7   relationship between the parties renders the unjust enrichment claim unavailable.[14] *See*

8   *Leasepartners Corp. v. Robert L. Brooks Trust Dated Nov. 12, 1975*, 942 P.2d 182, 187

9   (Nev. 1997) (citing 66 Am. Jur. 2d *Restitution* § 6 (1973) ("An action based on a theory of

10  unjust enrichment is not available when there is an express, written contract, because no

11  agreement can be implied when there is an express agreement.")). Archer's motion for

12  partial summary judgment on TEC's third claim for unjust enrichment (dkt. no. 162) is

13  granted.

14      In its motion against Postel, Archer seeks summary judgment on its third claim for

15  contractual indemnity under the Assignment. (Dkt. no. 159.) TEC's claims are premised

16  on events that allegedly occurred before TEC demobilized from the Project, including the

17  alleged failure to pay TEC for work performed under the TEC Subcontract. (Dkt. no. 48.)

18  TEC demobilized from the Project on February 29, 2012 (*supra* note 7), before the

19  effective date of the Assignment (March 1, 2012). As discussed above, the Assignment

20  expressly delineated Archer and Postel's respective rights and liabilities. Postel assumed

21  liabilities for "all obligations, responsibilities and liabilities of Assignor [Postel] under the

22  Contract existing prior to the date of this Agreement and agrees to indemnify and hold

23  _____

24      [13]In fact, if the paragraph does modify liability under the TEC Subcontract, then
25  the Assignment is not valid. *See Easton*, 230 P.3d at 830 (an assignment is invalid if it makes material changes to the underlying contract).

26      [14]Postel did not raise this argument in seeking summary judgment against TEC.
27  Postel argues that TEC's unjust enrichment claim fails because Postel did not receive any money on behalf of TEC. (Dkt. no. 154 at 22.) In response, TEC claims that it provided extra work at Postel's request that benefited Postel and for which Postel did not
28  bill Archer. (Dkt. no. 192 at 31-32.)

1   the Assignee [Archer] harmless from any claim or demand resulting or arising from such

2   pre-existing liabilities." (Dkt. no. 96-11 at 2.) As alleged, TEC's claims existed before the

3   Assignment and thus fall within Postel's responsibilities and liabilities under the TEC

4   Subcontract. Postel assumed and agreed to indemnify Archer for these liabilities.

5   Archer's motion (dkt. no. 159) with respect to Postel's indemnification obligations under

6   the Assignment is granted.

7        Archer's motion (dkt. no. 159) with respect to Postel's indemnification duty under

8   paragraph 9.3 of the Postel Subconstract is also granted.[15] Paragraph 9.3 of the Postel

9   Subcontract requires Postel to indemnify Archer from claims "arising out of or resulting

10  from Subcontractor's actual or alleged failure to perform under this Agreement in

11  accordance with the terms of this Agreement and the Contract Documents." (Dkt. no. 96-

12  4.) TEC's claims raise questions as to Postel's performance on the Project and fall within

13  paragraph 9.3's ambit. Postel thus has a duty to indemnify Archer under paragraph 9.3

14  of the Postel Subcontract. This finding also resolves a related motion — Archer's motion

15  to strike or disregard the affidavit of Danny Lucas (dkt. no. 201) — which the Court

16  denies as moot.

17       The Court's findings regarding Archer and Postel's allocation of liability under the

18  Assignment also resolve Archer's motion for partial summary judgment on Postel's third

19  and fourth claims in Archer's favor. (Dkt. no. 160.) It was Postel, not Archer, who

20  assumed liabilities under the TEC Subcontract that existed before the date of the

21  Assignment. (Dkt. no. 96-11 at 2.) The Assignment does not support Postel's third claim

22  for contractual indemnity under the Assignment. Nor does it support Postel's fourth claim

23  for breach of contract. The gist of Postel's argument is that in the Assignment, Archer

24  represented that it paid TEC $54,645.30 for money owed to TEC, such that TEC's claim

25  _____

26       [15]Archer also references paragraph 9.1 of the Postel Subcontract, but that
    paragraph addresses liabilities resulting from "bodily injury, sickness, disease or death,
27  or to injury to or destruction of tangible property." (Dkt. no. 96-4 ¶ 9.1.) Archer
    characterizes TEC's claims as relating to labor and equipment provided to Postel before
28  March 1, 2012, not injury to person or property. (Dkt. no. 159 at 10.)

1  that it is owed more payments means that Archer breached the Assignment. But there is

2  no dispute that Archer paid TEC the amount identified in the Assignment. For these

3  reasons, Archer's motion for partial summary judgment (dkt. no. 160) is granted.

4  **VII.   CONCLUSION**

5  The Court notes that the parties made several arguments and cited to several

6  cases not discussed above. The Court has reviewed these arguments and cases and

7  determines that they do not warrant discussion as they do not affect the outcome of the

8  parties' motions.

9  It is therefore ordered that TEC's motion for clarification and/or reconsideration

10  (dkt. no. 218) is granted in part and denied in part as stated herein.

11  It is ordered that the following motions are granted: (1) TEC's motion for partial

12  summary judgment against Archer relating to their contractual relationship (dkt. no. 153);

13  (2) Archer's motion for partial summary judgment on its third crossclaim for

14  indemnification against Postel (dkt. no. 159); (3) Archer's motion for partial summary

15  judgment on Postel's third and fourth crossclaims (dkt. no. 160); (4) Archer's motion for

16  partial summary judgment on plaintiff's third claim for unjust enrichment (dkt. no. 162);

17  (5) Traveler's motion for summary judgment (dkt. no. 158).

18  It is further ordered that the following motions are denied: (1) TEC's motion for

19  summary judgment on its counterclaim relating to Postel's abandonment (dkt. no. 151);

20  (2) TEC's motion for summary judgment against Archer relating to invalidity of the

21  Assignment (dkt. no. 152); (3) Postel's motion for summary judgment against TEC (dkt.

22  no. 154); (4) Archer's motion for summary judgment on TEC's first and second claims

23  (dkt. no. 161); (5) Archer's motion for partial summary judgment on its first counterclaim

24  against TEC (dkt. no. 163); and (6) Archer's motion to strike or disregard the affidavit of

25  Danny Lucas (dkt. no. 201).

26  DATED THIS 4th day of March 2015.

27

28  _____
   MIRANDA M. DU
   UNITED STATES DISTRICT JUDGE